(Decided Feb'y 24th, 1864.)

---

## THE MAYOR & CITY COUNCIL OF BALTIMORE, *vs.* THE BALTIMORE & OHIO RAIL ROAD COMPANY.

CORPORATIONS—POWERS OF EXPRESS AND IMPLIED: ACTS OF INCORPORATION—CONSTRUCTION OF.—A corporation is the creature of the law, and derives all its powers from the Act of Incorporation. It is exactly what that Act has made it, and is incapable of exerting any other faculties than those conferred by that Act, or in any other manner than it authorizes.

Every Act of Incorporation must be construed in such manner, if possible, as not to exceed the sovereignty of the Legislature granting it. It ought not therefore to be deemed to authorize any Act to be done which would exceed the jurisdictional power of the State, or interfere with the rights of other States.

A railroad corporation is no exception to the rule requiring a strict construction of corporate powers.

If the power claimed be not a power expressly granted, but one existing by implication, it must be shown that the implied power is necessary to carry into effect the powers expressly granted.

But it would be carrying this principle too far to hold, that a corporation cannot exercise any implied powers except such as are shown to be incidental to its very existence.

Acts of incorporation, like other statutes, must have a reasonable and sensible interpretation, so as to accomplish the intention of the Legislature, and all such powers are implied as may be necessary to carry into effect those

Mayor & C. C. of Balto. *vs.* Balto. & Ohio R. R. Co.

expressly granted; that is to say, such as are reasonably incidental to the exercise of the express powers.

——: ——: BALTO. & O. R. R. Co.—POWERS OF.—The Baltimore & Ohio Rail Road Company is not an ordinary private corporation, created only for the pecuniary benefit of its stockholders. The powers granted to it are of the most extensive and comprehensive kind, involving in their exercise great public interests, to promote which was the chief object of its charter.

Under the Act of 1836, ch. 276, which authorized the B. & O. R. R. Co., according to its discretion "to subscribe towards the construction of any lateral, continuing or connecting road, and to acquire any interest therein to an extent not exceeding two-fifths of its estimated cost," it derived the right to subscribe for or aid in the construction of any connecting road to the extent declared in the Act, and under such power might lawfully loan or furnish money to aid in such construction, and take a mortgage or other security therefor.

Where the thing done by a corporation is substantially that which its charter authorized, courts have not been disposed to declare the Act unauthorized, though not strictly and literally the same as that mentioned in the law.

JURISDICTION.—Where the decision of questions of expediency as to the fitness of means employed, is confided by the law to the board of directors of a corporation, courts of justice will not undertake to pass upon them; they are manifestly incompetent to the task, and to attempt to do so would often defeat the ends of the law; their province is to determine whether the corporation in the act complained of has exceeded its corporate powers.

BALTO. & O. R. R. AND CENT. OHIO R. R. ARE CONNECTING ROADS.—The connection between the B. & O. R. R. and the C. O. R. R., takes place at Benwood, four miles below Wheeling, where there is a lateral road not quite a third of a mile in length, which diverges from the main stem of the B. & O. R. R., and ends on the banks of the Ohio River, opposite to Belair, the station of the C. O. R. R., and the communication between the two roads is kept up by means of a steam ferry boat for the benefit of goods and passengers. HELD:

That the C. O. R. R. is a road connecting with the B. & O. R. R., within the meaning of the Act of 1836, ch. 276.

MAYOR OF BALTO. CITY—POWERS OF.—Assuming that the Mayor of a municipal corporation has power, not derived from an ordinance, to bind it in some cases by contract or obligations, yet this could only apply to contracts necessary and proper to carry out the purposes and objects of its charter; and he cannot claim, as incident to the power to prosecute suits and appeals, any power or rights not necessary to enable him so to prosecute suits, or appeals.

Mayor & C. C. of Balto. *vs.* Balto. & Ohio R. R. Co.

APPEALS AND APPEAL BOND.—The giving an appeal bond is by no means necessary to the complete exercise of the right or privilege of appeal, and the right to give such bond cannot be claimed as incident to the power of taking an appeal.

———: CONTRACTS WITH CORPORATION OF BALTO. CITY—HOW MADE.—An ordinance of the Mayor & City Council of Baltimore, provides that the City Comptroller "shall examine *all contracts made by the city officers,*" and also that "he shall report within thirty days after the meeting of the council in annual session, *all contracts made by the corporation as directed or authorized by the council.*" HELD:

That whilst under this ordinance *contracts can be made* by certain of the city officers, and it *may be* in certain cases by the *Mayor,* yet if they are to be regarded as "*contracts made by the corporation,*" they must be made "*as directed or authorized by the council,*" otherwise they will not have obligatory force to bind the corporation. As an appeal bond executed by the Mayor would be *the contract or obligation of the corporation of the city,* courts would not be justified in accepting such bond unless satisfied that it had been executed *by the direction or authority of the city council.*

APPEAL from the Circuit Court of Baltimore City :

The bill of complaint in this cause was filed by the appellants, to obtain an injunction against the appellees, enjoining them from making a loan to the Central Ohio Rail Road Company, or from purchasing certain mortgages outstanding against said company, or from divesting their (the appellees') funds for either of said purposes. The principal allegations of the bill were as follows:

"That your orator is the owner of forty-five thousand and fifty shares of the capital stock of the Baltimore and Ohio Rail Road Company, a corporation chartered by the State, for which said Acts of Assembly and the several supplements thereto, and for other Acts hereafter referred to, your orator prays leave to refer to the statute book of Maryland, and prays that so far as is necessary they may be deemed as part of this bill of complaint. That the said Baltimore and Ohio Rail Road Company came duly into existence, and is now engaged in carrying on the business for which it was chartered. Your orator further shows, that the Northwestern Virginia Rail Road Company, a corporation chartered by the State of Virginia, has completed

DECEMBER TERM 1863.                53

Mayor & C. C. of Balto. vs. Balto. & Ohio R. R. Co.

its work, which is now fully equipped and in successful operation, and by its connection with the Baltimore and Ohio Rail Road at Grafton, in the State of Virginia, and with the Ohio Rail Roads beyond Parkersburg, forms the most direct, the shortest and most reliable avenue for trade and travel between Baltimore and the city of Cincinnati, the heart and centre of the great west. That to aid the said Northwestern Virginia Rail Road company in the construction, completion and equipment of its work, the city of Baltimore, with the assent of the State of Maryland, endorsed the bonds of said Northwestern Virginia Rail Road Company to the amount of one million five hundred thousand dollars, taking a mortgage from the latter company to secure said debt, which is now the first mortgage or lien upon the property and franchises of said road; and the Baltimore and Ohio Rail Road Company with the assent of the State, the city of Baltimore and the stockholders of said company, also endorsed the bonds of said Northwestern Virginia Rail Road Company at different and sundry times, to the sum of one million five hundred dollars, and holds the second mortgage on said Northwestern Virginia Rail Road, to secure the payment of said endorsed bonds. Your orator further shows, that the Baltimore and Ohio Rail Boad Company heretofore loaned to the Central Ohio Rail Road Company the sum of four hundred thousand dollars, and took a mortgage from the said latter company, which is now the fourth mortgage upon the said latter work, a mortgage for twelve hundred and fifty thousand, with interest now amounting to one hundred and fifty thousand dollars, standing before and having priority over it, and also a second mortgage for eight hundred thousand dollars; and a third mortgage for nine hundred and fifty thousand dollars with interest thereon for six years, besides other bonds called income bonds, and various other indebtedness, amounting in all, as your orator is credibly informed, to nearly seven millions of dollars. Your orator is advised and therefore charges, that the said debt of four hundred

thousand dollars has been long regarded as lost and hopeless.

"Your orator further shows, that the Baltimore and Ohio Rail Road Company since the commencement and during the continuance of our national troubles, has been frequently taken possession of by those in rebellion against the government, (at least that portion of it lying in Virginia, between Harper's Ferry and Cumberland, Md.,) and its bridges have been destroyed, the tract and rails torn up and removed, and the cars and engines burnt or otherwise destroyed; insomuch that the cost of reinstating and repairing the same will amount to a very large sum of money, and will tax the ability of the company severely to meet and defray the said necessary expense. That your orator has heard with astonishment, that the Baltimore and Ohio Rail Road Company have determined to grant a loan to the said Central Ohio Rail Road Company, either by advancing the money or by the purchase of the said first mortgage on the property and works of the said company, the sum so to be advanced being twelve hundred thousand dollars.

"Your orator states, that on the 11th of February last past, a proposition was made to the board of directors of said Baltimore and Ohio Rail Road Company by the President thereof, recommending the said loan. That the said proposition was not only favorably entertained by said board, but the same was referred to the Committee of Finance, which committee will unanimously report favorably thereon with the exception of one member, this day, and within a few hours of this time, if not prevented from so doing by the interposition of this honorable court. That your orator has good reason to fear and believe, and does actually fear and believe, that the said loan will be consummated unless prevented by the injunction of this court. Your orator *distinctly* charges, that the said loan is 'beyond the corporate powers of the said company, and will be' a fraud upon the rights of your orator and the other stockholders of the same. That if the said Baltimore and Ohio

Rail Road Company have funds in hand, for which it has no use within its legitimate powers, it is in duty bound to hand the same over to the stockholders, to whom the same belong, or the same may be applied to repair the ruin and destruction on the said road as aforesaid.

"Your orator further charges, that the consummation of the said loan, if the same is not prevented, will lead to a policy on the part of the said company favoring the business and trade of the said Central Ohio Rail Road, and injurious, if not destructive, to the great interest which the said Baltimore and Ohio Rail Road Company already possesses in the Northwestern Virginia Rail Road, and injurious to the city of Baltimore as a stockholder in the Baltimore and Ohio Rail Road Co., and as a creditor of the Northwestern Virginia Rail Road Company. All which said actings and doings of the said Baltimore and Ohio Rail Road Company, are contrary to equity and good conscience, and unjust, illegal and injurious towards your orator." The bill then prayed for a writ of injunction against the said Baltimore and Ohio Rail Road Company, "commanding and enjoining the said company from making the said loan to the said Central Ohio Rail Road Company or from purchasing the said first or any other mortgage now existing against the said company, or from divesting the funds of the said Baltimore and Ohio Rail Road Company for any such purpose"

The injunction was granted as prayed for, after which the defendant filed the following answer.

"These respondents—without prejudice to their right to maintain that the said bill, filed at the instance of the Mayor of Baltimore, *ex mero motu*, during the session of the co-ordinate branches of the city government, and without their joint action, is not the bill of the corporation known as the Mayor and City Council of Baltimore—to so much of said bill as they are advised it is material for them to answer, answer and say: That they admit the allegations of said bill touching their charter, organization and present

working, as well as what is alleged in regard to the incorporation of the Mayor and City Council of Baltimore.

"They admit also, that the Northwestern Virginia Rail Road Company, chartered by the State of Virginia, has a road in operation from Grafton, on the line of the Baltimore and Ohio Rail Road, to Parkersburg, on the Ohio River; but they deny that the said road is fully equipped as alleged in the said bill, if by that it is meant to say, that the Northwestern Virginia Rail Road Company possesses rolling stock adequate to its purposes, or an organization to use it, if it possesses such. On the contrary, as these respondents allege, the said road is worked with the rolling stock of the Baltimore and Ohio Rail Road, and by the agents and employees of these respondents exclusively. These respondents further admit, that the Northwestern Virginia Road, in connection with the Baltimore and Ohio Rail Road on the east, and certain railroads in the State of Ohio on the west, forms a direct line of railway communication between Baltimore and Cincinnati. But these respondents deny the inference which may be drawn from the allegation of the bill, that Cincinnati is 'the heart and centre of the great West,' if it is meant that when Cincinnati is reached by a line of railway from Baltimore, the trade of the west is thereby secured to the latter city. On the contrary, these respondents say, that while Cincinnati is a western city of great importance, and a connection with which is most desirable, yet that the trade of the so-called west is by no means centred there. Looking to the country east of the Mississippi, this trade comes from a vast and fertile region, embracing the States of Ohio, Indiana and Illinois, and lying between and adjacent to the roads from Parkersburg to Cincinnati on the one side, and from Pittsburg to Chicago on the other; and through the heart of which passes the Central Ohio Rail Road, and its prolongation by other roads as far as St. Louis, on the Mississippi. In other words, the Baltimore and Ohio Rail Road should be regarded as the trunk of three great branches,

ramifying themselves over the west, one diverging at Grafton, one from Wheeling, and one from Cumberland;—all of these branches are important, and none more so than that which connects Baltimore with the great central region traversed by the Central Ohio Rail Road.—That the Central Ohio Rail Road is in connection with a road lateral to the main stem of the Baltimore and Ohio Rail Road, and diverging therefrom at Benwood, a point four miles below Wheeling, the present terminus of the said main stem, and which lateral road terminates on the edge of the Ohio River, opposite to Belair, the station on the Ohio bank of the river of the Central Ohio Rail Road.

"These respondents further admit, that the City of Baltimore endorsed the bonds of the Northwestern Virginia Rail Road Company for $1,500,000, and took a mortgage of indemnity, and that these respondents endorsed bonds of the said company to the amount of $1,000,000, secured by a second mortgage, and subsequently endorsed $500,000, secured by a third mortgage;—and these respondents say, that in addition to the sum last mentioned, they have advanced in cash to aid the said Northwestern Virginia Rail Road Company, upwards of $2,000,000. And these respondents admit, that they loaned to the Central Ohio Company the sum of four hundred thousand dollars, the same being now represented by bonds of said company secured by a fourth mortgage.

"And these respondents admit, that there are mortgages on the property of the Central Ohio Rail Road Company prior to the mortgage which secures the four hundred thousand dollars aforesaid; and which prior mortgages are of the following amounts, and stand in the order here enumerated:—A mortgage on the road from Columbus to Zanesville for $450,000, and one on the road from Zanesville to Belair of $800,000. These covering the entire line, constitute what is known as the first mortgage for $1,250,000. The second mortgage covers the same property, and is for $800,000. The third mortgage on the same se-

curity, is for $950,000. The aggregate indebtedness for principal of these three mortgages is $3,000,000. Then comes the mortgage under which these respondents are secured, nor do these respondents know of any intervening liens to their prejudice. The interest in arrear of these mortgages these respondents do not know with accuracy, but believe it may be estimated, under the agreements of that company, as a sum less than the aggregate interest on said bonds for four years.

"To so much of the said bill of complaint as alleges, that the aforesaid debt of $400,000 has long been considered hopeless, these respondents have no means of replying, inasmuch as they do not know by whom the debt has been regarded as desperate. No official action has been had on the part of the complainants expressive of their opinion, and if common report is what is to be relied on, it can certainly afford no ground for the action of this honorable court.

"That the said indebtedness may be injuriously affected, and its value endangered by depreciating it, and crying down the security on which it rests, and exaggerating the extent of the prior liens, is not impossible; but the road and its equipment, on which this claim is secured, has cost more than $7,000,000,—is one of the great trunk lines of the country, is one which is without a competitor for the trade which is peculiar to it, and if properly and judiciously managed, ought to be able to pay off its indebtedness, including the amount due to these respondents, and possibly be ultimately of value to its stockholders, whose money to the extent of one and a half millions of dollars, has been invested in it.

"Your respondents admit, that since the commencement of the present troubles, the business of the Baltimore and Ohio Rail Road in the Valley of Virginia, has been much and more than once interfered with by the military operations in that quarter. But the extent of these interferences is so vaguely stated in the said bill, that these respondents

can only admit of the fact generally, without assenting to the particular allegations of the said bill in this connection. But to so much of the said bill as alleges that the repair of the damage done will cost a large sum of money, and tax severely the ability of the company to mect and defray,— the respondents answering, say, that the said repairs have been so far made, and paid for from the means heretofore accumulated, and the general resources of the company,— that the road is open in its entire length, and is doing at this time a greater business than has ever before passed over it, and has been in full operation ever since the 7th day of January last; and that the ability of the company has not only not been severely taxed, but the company has just declared a dividend of three per cent. to its stockholders, payable in cash on the 31st inst., and has large funds earned and soon to be received by it, more than sufficient to put its road throughout into the best possible condition, to compete with other roads having different termini, with interests hostile to those of the City of Baltimore.

"That to so much of the said bill of complaint as alleges that the complainants, the Mayor and City Council of Baltimore, had heard with astonishment that these respondents had determined to grant a loan to the Central Ohio Rail Road Company, these respondents answer and say, that they are disposed to believe that the allegation has been made inadvertently, inasmuch as the complainants are a corporation which can only act by resolution of it component parts, one of which is the second branch of its City Council, and which branch, only a day or two before the filing of the said bill, absolutely defeated a proposition adverse to the course now objected to, by a very large majority, the vote being eight to two. But these respondents admit, that they propose to cause themselves to be substituted in the place and stead of the holders of the first mortgages of the Central Ohio Rail Road Company, and say that the measure is one eminently judicious in every respect; that the interest will be paid on the money

which may become necessary in the transaction, cannot be doubted. If there is any doubt, the business will not go forward. These respondents will thus secure an investment of funds, bearing seven per cent. interest, which would otherwise accumulate on their hands, until such time as they needed them for the objects already indicated. They will naturally acquire an influence in the management of the affairs of the road, in exercising which for their own benefit, they will necessarily advance the interest of Baltimore, with which their own are indissolubly connected; and they will also in this way be enabled, as they have every reason to believe, to protect materially the $400,000, already invested as a loan in the Central Ohio Rail Road.

"And in this connection these respondents append hereto a copy of the resolutions adopted by them, at their meeting held on the 11th instant, and which authorise proceedings so soon as the order of this honorable court, granting an injunction, shall be dissolved. To so much of the said bill as refers to the action of the board of directors of these respondents and their Finance Committee, and the possible action of the board at the meeting held the day the injunction was served, these respondents for answer refer to the said resolutions, which show the action which actually took place. And to so much of said bill as charges that the substitution of the said Baltimore and Ohio Rail Road Company in the place and stead of the first mortgages of the Central Ohio Rail Road Company, 'is beyond the corporate power of the said company,' to wit: of these respondents, and will be a fraud on the rights of the complainant and other stockholders; and that if these respondents 'have funds in hand they have no use for within their legitimate power, they are in duty bound to hand the same over to the stockholders, to whom the same belongs, or the same may be applied to repair the ruin and destruction on the said road as aforesaid;' these respondents answering say, that the measure proposed in the resolutions aforesaid, is altogether within the corporate power of these respondents,

as they are satisfied this honorable court will decide when the question comes before it, and that if within the power of these respondents, it can only be a fraud on the complainants by detaining from them their dividends, a matter which it is respectfully suggested this court is not competent to enquire into in the present form of proceeding or in this cause, the law pointing out very clearly the mode of redress open to the complainants in this regard.

"To so much of the said bill as charges that the proposed measure will be the inauguration of a policy favoring the Central Ohio Rail Road, and injuring, if not destroying, the interest which the complainants have in the Northwestern Road, the Baltimore and Ohio Rail Road and the city of Baltimore, these respondents say, that the allegation is so utterly vague and intangible, as to make it difficult to meet it. It treats the bill as a bill *quia timet*, without specifying the injury apprehended. But so far as it can be answered, these respondents answering say, that the interest which they, themselves, have in the Northwestern Virginia Road, is more than double that of the plaintiffs; that identified as their interests are in the city of Baltimore, the benefits which they respectively confer on each other are reciprocal, and they would be prejudicing themselves were they to do aught to hurt either the Virginia road, or the city to which, through the road of these respondents, it has been made tributary. That with its river trade and its Cincinnati connection, the Northwestern road is in a great degree distinct from and independent of the Central Ohio Road, while the latter will bring to Baltimore a traffic which the former cannot reach, and which, if it is not brought to Baltimore by the measures proposed, will unquestionably be diverted in a greater or less degree to a rival city. And respectfully submitting that they have fully answered the said bill of complaint, these respondents pray to be hence dismissed with their reasonable costs in this behalf unjustly sustained."

The exhibit of resolutions referred to in the foregoing answer, is as follows, to wit:

"Whereas, the Baltimore and Ohio Rail Road Company is, at this time, the holder of $400,000 of the fourth mortgage bonds of the Central Ohio Rail Road, secured by mortgage on its property subject to prior mortgages thereon, that is to say: a mortgage on the western division of the road from Columbus to Zanesville, for $450,000, and one on the eastern division from Zanesville to Belair, for $800,000, which, covering as they do the entire line, constitute the first mortgage thereon; a second mortgage for $800,000, covering the entire line; a third mortgage on the same property for $950,000; making an aggregate indebtedness of $3,000,000, secured by mortgages having precedence to that under which the bonds held by this company are secured; and whereas, proceedings have been instituted in the Circuit Court for the Southern District of Ohio, for the purpose of foreclosing the first and second mortgages aforesaid, which, if prevented at this time, may seriously affect, if not absorb in the payment of the prior liens, the security which this company has for its claim of $400,000.

"And whereas, this company is advised that it has the power by paying the first mortgagees the amount due to them, to substitute itself in their place and stead to all intents and purposes, and in this manner to exercise a control over the proceedings in the said Circuit Court looking to a sale aforesaid.

"And whereas it is desirable that this company should, if practicable, exercise such control as well for the security of the debt due to it, as for the purpose of preventing the Central Ohio Rail Road from passing at this time into hands, that might by possibility be disposed to use it to the prejudice of this company and of the city of Baltimore, by diverting trade and travel, which while the two roads continue to be worked in concert, may be reasonably expected to come to the said city.

"Therefore, be it resolved, that the committee on Finance is hereby authorised to take such steps as may be necessary in their judgment, to substitute this company in the place and stead of the first mortgagees aforesaid, paying to them the amount due upon their respective claims under the said mortgages; provided, that such substitution and payment shall not be made until such measures are taken, or agreement entered into, as shall dismiss or stay proceedings to effect a sale of the mortgaged property by the second mortgagees aforesaid, and estop them from paying off the first mortgage for the term of ———— years from this time; nor until an agreement shall be completed that shall secure to the satisfaction of the said Committee on Finance, the harmonious working of the Central Ohio and the Baltimore and Ohio Rail Roads, looking to the interests of the latter and the city of Baltimore; nor until the punctual payment of the interest on the first mortgage bonds aforesaid, shall be satisfactorily secured; 'nor before a further order of the Circuit Court for Baltimore city, in the suit instituted in the said Court by the Mayor and City Council of Baltimore against this company, be first had and obtained by this company in the premises mentioned, in the order passed by said court on this day therein.' "

On filing its answer the defendant moved for a dissolution of the injunction; and the following admission and agreement was entered into by the parties.

"It is admitted in the above case that the connection between the Baltimore and Ohio Rail Road and the Central Ohio Rail Road takes place at Benwood, four miles below Wheeling, where there is a lateral road not quite a third of a mile in length, which diverges from the main stem of the Baltimore and Ohio Rail Road, and ends on the banks of the Ohio River opposite to Belair, the station of the Central Ohio Rail Road, and that the communication between the two roads is kept up, by means of a steam ferry boat, for the benefit of goods and passengers.

"It is agreed that either party may read all Acts of Vir-

ginia and Maryland which are printed in any authentic form, in the same manner as if the same had been referred to and made part of the bill or answer.

"It is admitted that the Central Ohio Rail Road runs from Belair on the west bank of the Ohio River opposite Benwood, which is its eastern terminus, to Columbus, the capital of Ohio, which is its western terminus. That the entire work lies within the State of Ohio.

"Either party to be at liberty to use railroad maps for illustration, and to read printed railroad reports and documents."

On the motion to dissolve the injunction which was heard upon bill and answer, without depositions, the Court below, (KREBS, J.,) delivered the following opinion:

"The bill in this case was filed by the complainant, for the purpose of obtaining the interposition of this Court, by way of injunction, to prevent the defendant from 'granting a loan to the Central Ohio Rail Road Co., either by advancing the money or by the purchase of the first mortgage on the property and works of the said company,' and 'from diverting the funds of the defendant, in aid of the said Central Ohio Rail Road Co., as above stated, or otherwise.' The sum of money, the advance of which by loan, purchase, aid to the said company, or otherwise, the complainant seeks to prevent, is $1,250,000, the amount of what is called the first mortgage upon the works and property of said company, given to secure the payment of bonds negotiated by it, to pay the costs and expenses of its works, and charges incident thereto. The standing of the complainant in court to make the complaint, and to ask the relief which it does, is asserted upon the ground, that it is the owner of a large number of shares of the capital stock of the said Baltimore and Ohio Rail Road Company; that it, the complainant, has assumed very large responsibilities for the Northwestern Virginia Rail Road Company, chartered by the State of Virginia, which has constructed a road in connection with the said B. & O. R. R., at Grafton, in. Va., and

extending to Parkersburg, Ohio River, by endorsing the bonds of the said Northwestern Va. R. R. Co., to the amount of a million and half dollars; that this road forms the shortest and most direct avenue for trade and travel between Baltimore and Cincinnati. The complainant insists, that the said loan or aid to the Central Ohio R. R. Co., or purchase of the said mortgage, should not be permitted, because it would lead to a policy on the part of the defendant favoring the business and trade of the Ohio Road, and injurious, if not destructive, to the great interest which the defendant has in the said Virginia Road; and injurious to the complainant as a stockholder in the defendant's road; and as a creditor of the said Virginia Road it would be fraud upon the rights of the complainant, and other stockholders in the B. & O. R. R. Company. And because *it is beyond the corporate powers of the said company.*

"There are other reasons of minor importance, suggested in the bill, against this application of said funds, but they are comprehended in the same class with some of those above mentioned, and it is not necessary to make particular reference to them. In regard to any objections to the actions of the defendant, in reference to this transaction, urged by the complainant, which look to the policy which the defendant may pursue in regard to the said Ohio Road, or to the measures it may adopt in consequence of any interest it may acquire therein, it is sufficient to say that this Court, in deciding as to the relief prayed in this bill, cannot consider or be influenced by such objections, for the reason, that whilst a court of equity will *restrict a corporation within the sphere of its chartered powers*, it will *not interfere with the course of policy*, or with the plans and measures of expediency, *which its officers or managers* may think proper to *adopt and pursue in the legitimate exercise of its powers.* In regard to the charge, that the consummation of this transaction would be a fraud upon the defendant and other stockholders, &c., it is not meant of course to charge actual fraud or fraud in fact, but legal fraud only,

9    v. 21

growing out of the assumption and exercise of power not conferred by the charter of the company.

"The remaining and important point to be considered, is that which relates to the power of the Baltimore and Ohio R. R. Company to consummate this transaction. Has this company the right or power under its original charter, or under any supplement thereto, to loan this money to the said Ohio Company, or to aid it by an advance thereof, or to purchase and take an assignment of this first mortgage, and of the bonds secured thereby; for it is against its action, in either of the above modes, that the opposition of the complainant is directed.

"1. The defendant insists that this right and power is conferred upon it by the Act of 1836, chap. 276, which is a supplement of its charter.

"2. That it has the right and power to purchase and take an assignment of this mortgage, because it is a creditor of the said Ohio Company to the amount of $400,000, for which it holds a fourth mortgage upon the works and property of that company, and such purchase and assignment are necessary to prevent a foreclosure of said first mortgage, and sale of the property of said company, at great sacrifice, and loss of the defendant's mortgage claim. The Act of 1836, supplemental to the charter, enacts, 'That when, *in any case,* the President and Directors of the Baltimore and Ohio Rail Road Company *shall be of the opinion* that the *construction of a Rail Road, lateral to any part of the road or roads of the said company, or in continuation of or connection with such lateral road,* would be *advantageous to said company,* but that it would not be convenient for them to incur the whole cost of constructing the same, *then the said President and Directors may,* on behalf of said company, *subscribe towards the construction of such lateral, continuing or connecting road, and acquire an interest therein to an extent not exceeding two-fifths of the estimated cost of constructing any such road.'* I understand that there is no denial of the fact, that the Central Ohio Rail Road is fairly included

within the class of 'lateral, continuing or connecting roads,' to which the above Act applies. Further, it is admitted, that this road is now in connection with the Baltimore and Ohio Rail Road, and it is not denied that this connection is '*advantageous to the said company.*'

"It is insisted, however, by the complainant, that the question here is not in regard to the '*construction* of a road that would be advantageous to the said company,' and 'towards the construction of which,' as authorized by the said law, the said company might subscribe, and thus give it aid, but this is the *case of a road already constructed, equipped and in full operation,* and according to a proper construction of the law, the defendant can give it no aid in the manner proposed, and cannot appropriate funds for any of the purposes above referred to. The complainants contend for a strict and rigid construction of this supplement to the charter of the said company, insisting upon the well established principle, that a corporation can exercise no powers but those expressly granted by its charter, or such as are incident to or necessary for the execution of the powers granted. The case upon which they have relied with most confidence, is that of *Colman vs. Eastern Counties Railway Company,* an English corporation. It is reported in 10 *Beavan's Rep.,* 1, and bears a striking resemblance in some respects to the case before the Court. There the Directors of a Railway Company conceived that it would add to the traffic and profits of the railway, if a steam packet company could be formed, communicating between the termination of their road and the northern parts of Europe, and accordingly took proceedings for the establishment of such a company.

An injunction was applied for and granted, upon the application of one of the shareholders in the steam packet company, to restrain the Directors from entering into the proposed arrangement. Upon a motion to dissolve this injunction, it was said in behalf of the parties who had obtained it, for the 'purpose of promoting the *general* inter-

ests of the *Railway Company*, they propose to give encouragement to the establishment of an adjunct to the railway, acting in direct communication with it, and must inevitably greatly extend the traffic of the railway and increase its profits.' The mode in which the encouragement was to be given, was by a guarantee of a certain annual dividend upon the stock paid in by the stockholders in the steam packet company; and, upon a dissolution of the company, the payment of its capital to them in exchange for a transfer of its assets and property. The complainants, however, insisted that the injunction should be continued, ' that the powers given by the Legislature to companies, are given between the public and the company; that such companies are to be strictly confined to the powers given them by their Acts. It is therefore incumbent on the defendants to shew, that their Act gives them either express or implied powers of carrying into effect their projected arrangements. It would be contrary to the policy of the law, to allow extensive powers given for certain purposes, *to be diverted*, without the sanction of the Legislature, *towards a perfectly different object.*' The Master of the Rolls was of opinion, that the Act of Parliament incorporating the railway company, gave it no power to make such an arrangement, and continued the injunction. He said: 'I am clearly of opinion, that the powers that are given by an Act of Parliament like that now in question, extend no further than is expressly stated in the Act, or is necessarily and properly required for carrying into effect the undertaking and works which the Act has expressly sanctioned.' * * * 'Is there any thing in the Act of Parliament sanctioning such a course of proceeding? Do the powers to construct, maintain and regulate the traffic, imply that the directors are to be at liberty to pledge the funds of the company for a *completely different transaction*, in the hope that it may be a profitable one, and add to the profits of the railway company? Surely there is nothing in the powers given by this Act of Parliament, which can authorise that.' The

DECEMBER TERM 1863.                    69

Mayor & C. C. of Balto. vs. Balto. & Ohio R. R. Co.

learned judge, however, in the course of his opinion says:
'I think it right to observe that companies of this kind
have so recently been introduced into the country, that
neither the Legislature, nor Courts of Justice, *have yet been
able to understand all the different lights in which their trans-
actions* might properly be viewed.' And he further said:
'It has been argued, that I must either allow this to be
done, or that I must hold that nothing can be done, that
is at all out of the express words of the Act of Parliament.'
This he by no means admitted, but in reply to this argu-
ment said: 'I shall remain of opinion, until it has been
otherwise decided by higher authority, that this is not
within the powers given by the Act of Parliament, and
when another and different case is brought before the Court,
it will be judged of by the circumstances which attend it.'

"I have considered this case somewhat at large, because
the solicitor for the complainant has seemed willing to rely
upon it, as by itself sustaining the principles of strict
and rigid construction which should govern this Court,
in defining the powers of the railroad company under its
charter, and the supplement to it; but I cannot discover
that it has the force and weight for that purpose which is
ascribed to it. In the first place, the distinguished Vice
Chancellor who decided it in 1846, modestly acknowledges
that he had but imperfect lights to guide him to a proper view
of the transaction of these companies, because at that time
they had but recently been introduced into the country.
In the second place, he regarded the arrangement into
which that company was about engaging, as a diversion of
its funds from its legitimate business to '*a completely differ-
ent transaction.*' And in the third place, he declined to
admit as a consequence of his decision, 'that he held that
nothing could be done, that is at all out of the express
words of the Act of Parliament' creating the company, the
construction which the complainant contends for; and de-
clared *that another* and different case would be judged by
the circumstances attending it. I am therefore of opinion,

that there is nothing in this authority that demands of me the adoption of the strict and rigid construction of the charter of the Balt. and O. B. R. Co., which the complainant contends for.

"If this Court then is free to adopt one or the other of these rules of construction, what guide has it to direct its choice? Smith, in his Commentaries on Statutory and Constitutional Construction, sec. 491, says: 'The *reason of the Statute*, that is, *motives* which led to the making of it, the object in contemplation at the time the Act was passed, is another criterion by which to ascertain the true meaning of the Act. Attention should be paid to the circumstances whenever there is question either of explaining an obscure, ambiguous, indeterminate passage in the Act of the Legislature, or of applying it to *a particular case;*' so in sec. 488: In referring to what is called 'extensive interpretation,' he says, 'as we extend a clause *to those cases, which though not comprised within the meaning of the terms, are,* nevertheless, *comprised in the intention of that clause,* and included in the reason that produced *it, in like manner,*' &c. It is needless to multiply references to authorities to prove what will be found distinctly stated by elementary authors, and set forth in numerous decisions of high authority: that Courts in expounding and construing Statutes, are not confined to the mere *words of the law,* to the *meaning only* of the *terms used,* and to a *literal interpretation* of its language; but must take a more enlarged view and give their attention '*to the reason of the Statute,*' '*the motives which led to the making of it,*' '*the object in contemplation at the time the Act was passed,*' and '*to the circumstances*' under which it was enacted. This duty necessarily requires of me an historical glance at least at the origin of the Baltimore and Ohio Rail Road Company. It was brought into being in the year 1826, by the enterprise and energy of certain leading members of this community, who sought to give this city a fresh start, upon a new track, in the race of competition for the trade of the west.

DECEMBER TERM 1863. 71

Mayor & C. C. of Balto. vs. Balto. & Ohio R. R. Co.

They were the pioneers in the great Railroad Enterprise, at a time when there was no such road between trading points in the world, and but two short samples in this country used for running coal from mines to a near point of delivery, and the like number used for the same purpose in England. It would be out of place for me to indulge a natural feeling of State pride, by more than a simple reference to the gigantic developments of this mighty system which had its first impetus in the determined resolution, and early action of these public spirited individuals, and the liberal grants of power from legislative authority. I have referred only to legitimate subjects of judicial attention, for the purpose of ascertaining the reason, motives, objects and purposes, in contemplation of the Legislature, when the charter of this company was granted and this supplement passed, and the extent and course of the ramification of such roads, connections with which would be 'advantageous to the said company.'

"The motive, then, which gave rise to this work was rivalship with other cities, and the object and purpose was to attract to the city of Baltimore the trade of the growing west, for which they were competitors with it. These facts must be weighed and considered by the Court, in determining the construction to be given to this supplement, and deciding as to the cases and transactions to which it may properly apply. But there is, fortunately, in the decision of the highest tribunal of this State, a clear and distinct expression of opinion upon the above principles and rules of construction, brought together from the highest authorities, which relieves this Court from much responsibility in applying them to this case. In the case of the *Mayor & C. C. of Balto. vs. Balto. & Ohio R. R. Co.*, 6 *Gill*, 288, the Court of Appeals employs this language: 'It is a matter of *notoriety and history*, that in chartering *the Baltimore and Ohio Rail Road Company*, the Legislature and the people of Maryland, regarded the completion of the work as a great *State object*, *tending* eminently to

*promote* the future wealth and prosperity *of Maryland,* and particularly of the city of *Baltimore,* and to contribute to the permanence of the Union of the *United States.* They were also duly sensible that this gigantic and patriotic undertaking could not be accomplished but at great expense, and hazard of pecuniary loss to its undertakers; as an encouragement to the enterprize they were willing to confer on it every immunity, privilege and exemption, which could reasonably be required, and tend to its completion. In *expounding,* therefore, *those* provisions of the *charter of the company,* by which its expressed *privileges are imparted, liberal rules of interpretation,* for its benefit, ought to be adopted to effectuate the benevolent *designs of the Legislature,* and *not such rules of restriction* and *limitation, as should be applied* to the *charters of companies incorporated for the peculiar benefit of their stockholders.'* In that case the Court gave a construction to certain clauses in the charter of the company, not according to the literal import, or verbal meaning of the phrases, but in conformity with their views of the intention and purpose of the clauses. Now what is the object and purpose of the arrangement or transaction proposed by the company? It is unquestionably to secure the benefits and advantages to result from a connection with an important road in continuation of a lateral road, connected with their main stem. The Central Ohio Road is in jeopardy from legal proceedings, on the part of a creditor who has the power to compel a sale of its works, and thereby throw them into such hands as that the Baltimore and Ohio Road will derive no benefit and advantage from a connection with the former, but will lose all the trade which it now contributes. To secure and retain this connection, which the president and directors deem greatly 'advantageous to the company,' they propose to take the place of the creditor who holds the first mortgage on the works and property of debtor, given to secure bonds executed by it. The money for which these bonds were given, was no doubt applied 'towards the construction of this

Central Ohio Road, and to pay the cost of constructing' the same. Now according to the strict and literal language and terms of this supplement, the President and Directors of the Baltimore and Ohio Road would have been authorized to subscribe towards the construction of this road whilst it was in progress, and to have paid two-fifths of its estimated cost, and to *have thus acquired an interest* therein *to that extent.* This might have been done to bring into existence a road which was advantageous to the defendant. The President and Directors being of opinion that the existence of this road, so far as they are interested in it, is threatened, propose merely to do now what they had an unquestioned right to do before the work was completed, to advance to parties who *originally contributed the money to pay the cost of constructing the work,* the money so furnished by them. This in my opinion is to 'effectuate the *designs* of the Legislature' in passing this supplement, to give the company such an advantage and benefit as the law intended it should acquire by an original subscription to the cost of the work, and substantially in the manner authorized, though not at the period designated in the very words of the law.

"It certainly cannot be objected in this case as it was in the case from 10 *Beav.*, 1, above referred to, that the application by the railroad company of its fund, to the consummation of this transaction, would be '*to divert them towards a perfectly different object*' from that contemplated by this supplement. It was evidently because the learned judge who decided the case, believed that the funds of the company would be so diverted, that he denied the power in the company to be concerned in the establishment of a line of steam boats. His language is, 'do the powers to construct, regulate and maintain the traffic, imply *the liberty to pledge the funds of the company for a completely different transaction.*' The railroad company here by no means designs to apply its funds to 'a perfectly different object,' or for a 'completely different transaction,' from that authorized by

10      v. 21

their supplemental charter. That gives them power to aid a road that may be advantageous to their road; to give this aid by the appropriation of money towards the cost of such road, and thus to acquire an interest in such road to the extent of the money so expended. This is precisely what the railroad company proposes to do, varying only from the literal terms of the authority, in regard to the time at which the aid is furnished, the aid being given after the road has been completed, by taking the place of those who originally supplied the money to pay the costs of its construction. This is far from being a *'perfectly different object,'* or a 'completely different transaction.' 'Where the thing done by a corporation is substantially that which its charter authorized, courts have not been disposed to declare the Act unauthorized, though not strictly and literally the same as that mentioned in the law.' In the case of *Thompson & others vs. R. R. Co.*, 3 *Sand. Ch. Rep.*, 625, a railroad company was chartered with power *to build a bridge* for their railway across a river. At or near the place where it was to cross, a private bridge had been built by individuals duly authorized by law; and the company purchased the bridge of the owners. The objection was made, that the company thought it had the power *to build a bridge*, yet it had no power to purchase one *already built;* but the Court said that the owners were authorized to sell, *and the company to buy the bridge.* If by an adherence to the literal meaning and construction of the language of this supplement, I should deny to the company the power and right to consummate this transaction, I am of opinion that I would disregard the manifest direction of the Court of Appeals, in the case above cited, 'to expound the provisions of this charter' and its supplements by liberal rules of interpretation, 'for the benefit of the company, to effectuate the benevolent design of the Legislature.'

"But it is insisted by the company, that independently of any power derived from a proper construction of its charter, it has the right, as a creditor of the Central Ohio Road,

and the holder of its bonds secured by mortgage, to protect itself, and fortify the security which it already holds, by taking an assignment of this mortgage, previous to that which it already has.

"An examination of the authorities will shew, that it is well settled, that where a corporation is authorized by its charter to *become a debtor* by borrowing money or dealing with persons in such manner as that they, by lawful transactions, become its debtor, it has in one case the incidental right to take mortgages, assignments of stock, or of other property, to secure the moneys owing to it by its debtors; and in the other case, the like right to give mortgages of its property, or in any other usual manner, to secure the debts which it lawfully contracts. It has, in fact, all the rights and powers incidental to the reciprocal relation of debtor and creditor. As creditor, it may compromise with its debtor; give him time, accept something else in satisfaction, give him release, &c. *Bank of Augusta vs. Earle*, 13 *Pet.*, 521. *It may hold lands in another State*, which have been conveyed to *it as security for or in payment of a debt. N. Y. Dry Dock vs. Hicks*, 5 *McLean*, 111. *Farmers Loan & Trust Co. of N. Y. vs. McKinney*, 6 *Id.*, 7. And where a Statute prohibited banks from purchasing and holding real estate, it was held in construction of this provision, that a bank which had lawfully obtained a mortgage on lands to secure an existing debt, might make its security available *by purchasing the property. Ingraham vs. Speed*, 30 *Miss.*, 410. *Sacket's Harbor Bk. vs. Lewis Co. Bk.*, 11 *Barb.*, 213. *Allen vs. R. R. Co.*, 11 *Ala.*, 437. *R. R. Co. vs. Talman, et al.*, 15 *Ala.* 472. *Silver Lake Bk., vs. North*, 4 *Johns., Ch. Rep.*, 370. *Trenton Bk. vs. Woodruff*, 1 *Green Chan. (N. J.,)* 117. *State vs. Milburn, et al.*, 9 *Gill*, 112. 21 *How.*, 441. 1 *R. J.*, 347. 3 *Wood*, 6. See, also, *Angel & Ames on Corporations, sec.* 191. This company is already, and has been for many years, the holder of the bonds of the Central Ohio Rail Road to the amount of 400,000 dollars. The power of the company to make an investment of its money in these bonds, as it

was made, was not questioned by the corporation of Baltimore nor by any one else; and it now proposes to do nothing more than it did then, though on a larger scale; and upon the point just considered, I have no doubt that, in the exercise of the rights of a cautious and prudent creditor, it has the power to take the assignment of this first mortgage, with a view to fortify its lien for, and further secure the debts which this Ohio Company already owes to it.

"As to what has been said by way of objection to this transaction, that the company will go beyond the limits of the State to consummate and exercise an extra-territorial power, and acquire an extra-territorial right, it is sufficient to say, that the Baltimore and Ohio Rail Road Company is, in its very nature extra-territorial. It was incorporated for the purpose of constructing a road from the city of Baltimore, to a point far beyond the limits of the State, to the Ohio River. To do this, it had to deal with a foreign jurisdiction, to acquire extra-territorial rights and powers, which were cheerfully granted to it by a neighboring State, and under which it completed its works to a point on that river. So under the supplement which I have been considering, the power of the company to give aid by contributing to the cost of constructing lateral roads, &c., is not restricted to this State, but may be extended to any such roads though out of the State of Maryland. I should not do justice to myself in view of the responsible task which the decision of this case devolves upon me, if I closed this opinion without referring in support of my action to a decision of high judicial authority in England, shewing the course which the Courts of Equity in that country pursue in cases like this, where *some doubt may be raised in regard to the rightful exercise of power, by a corporate body;* and where *the power, if it be not allowed and exercised at the time, must, with the fruits of it, be forever lost.* It is the case of the *Attorney General vs. The Mayor, &c., of Liverpool,* reported in 1 *Mylne & Craig,* 171. The corporation by its Common Council had determined to raise a sum of

money exceeding half a million of dollars, and in further-
ance of their design, were negotiating for a loan upon its
bonds and mortgage of its corporate property, to be appro-
priated to a specific purpose admitted to be laudable and
praiseworthy.

The parties objecting to the measure through the infor-
mation filed by the Attorney General, were merchants in
that city; and they submitted to the Court, that the raising
of such loan, and the proposed application thereof when
raised, would be in direct contravention of the scope of the
Act of Parliament, and of the intention of the Legislature
in that behalf, and prejudicial to the rights and interest of
the rate-payers of the borough of Liverpool, &c.    They
also referred to the financial condition and indebtedness of
the corporation to shew, that such application of funds
would be improvident and improper under the circumstan-
ces; and alleged that such proceedings were a fraud upon
the Act and abuse of powers, and they prayed that the de-
fendants might be restrained by injunction from carrying
into effect the proposed loan, and from taking up, at inte-
rest, money for the purpose of making the expenditures
contemplated.    An injunction *ex-parte* was granted, and
upon the motion to dissolve it, it was said by the solicitor
in favor of the motion, 'that it was unnecessary to discuss
the *conduct* of the defendants, or the propriety of the par-
ticular appropriations which they propose to make.'    These
may be assumed to be strictly correct and laudable, yet it
will by no means follow, that the Court will dissolve the in-
junction or leave them at liberty to carry their plan into
execution.    *The question is strictly one of right.*    It was in-
sisted as it is here, that what the defendants proposed to
do, ' was wholly repugnant, not only to the particular pro-
visions, but to the general scope and purview' of the Act
of Parliament, and ' directly in fraud and contravention
of its provisions and spirit.'    The decision was made by Ld.
Langdale, Master of the Rolls; he said, 'The question is,
whether under the provisions of the statute a case is raised

which makes it incumbent on the Court to prohibit the act
which the corporation of Liverpool are about to carry into
effect.' He continues, 'as I have found grounds to support
the order I propose to make,' (which was to dissolve the in-
junction,) 'independently of expressing any opinions which
may arise in the construction of that Act, my purpose *is
rather to state difficulties*, which may be supposed to exist *on
the face of the statute*, than to give a *judicial opinion on any
of these questions.*' I have no doubt whatever of the juris-
diction of this Court to prevent any thing from being done,
which is *clearly* against the *object*, principle and provisions
of the statute.' He says further, 'that the statute is
formed in words which may leave it to considerable discus-
sion, what is its intention and effect, and whether or not
the subject-matter in question comes within its provisions;'
and further, 'it is the right to *do the act* that is challenged,
and those who differ with the corporation as to the pro-
priety of the act or *the power* to do the act, are certainly
entitled to put the question in a train for adjudication.'
And he then adds that, 'if the defendants can do this at
all, they can only do it between the present time and the
26th of this month.' * * * 'It is obvious, therefore, that
to *continue the injunction, instead of being, as it ordinarily is,*
the means of preserving rights, would, in this instance,
operate to destroy them. On the other hand, the only ob-
ject I could have in continuing the injunction, would be, to
prevent the property from being injured, that is to say, to
prevent its being exposed to any danger from the act pro-
posed to be done. Now I do not find that any danger ex-
ists as to the property in question. It is a large sum of
money, but *the case is not put upon that*, it is not put upon
the circumstance of there being any danger from the mode
in which the property is intended to be dealt with.
Balancing the inconveniencies which would arise from con-
tinuing the injunction and from dissolving it, I should un-
questionably run much greater risk of doing mischief by
continuing the injunction than I can do harm by dissolving

it.  I think, therefore, exercising the discretion ,which is vested in the Court in cases of this kind, my proper course is to dissolve the injunction.'

"The case cited, and that at bar are so similar, that I may almost adopt the language above quoted.   The most that can be said in regard to the meaning of this supplement, is, that it is doubtful.   Here the transaction contemplated by the company must be consummated immediately, otherwise the benefits to result from it will be lost, as proceedings are now ready, in the proper court in Ohio, for an *immediate sale* of *the property of the Ohio Company.*—Here the case has not been put upon the *danger to the money* to *be invested in this first mortgage,* or *that it will be lost by being so invested.*   The works and property of the Ohio Road have cost more than $7,000,000, and it is not pretended that this first mortgage is not perfectly safe, and that the property is not amply sufficient to secure it.   As this purchase, or investment, if made at all, must be made at once, as this question of right to make it is merely doubtful, and as there is no danger of losing the money to be invested, I must, adopting the view of the learned Judge whose language I have quoted above, dissolve this injunction."

From the order passed in conformity with the foregoing opinion, the complainant took an appeal, and afterwards filed a petition praying that it might be allowed to give such a bond as would stay the operation and effect of the order dissolving the injunction; and that upon the giving of said bond, the order dissolving the same might be suspended until the appeal was heard and determined.

This petition the Court, KREBS, J., refused to grant, for the reasons stated in the following opinion:

" On the 7th day of April 1863, this Court passed an order dissolving the injunction heretofore issued in this cause which restrained the Rail Road Company from investing its funds, to the amount of twelve hundred and fifty thousand dollars, in the purchase of Bonds of the Central Ohio Rail Road, called the First Mortgage Bonds.

" Under the provision of the 21st section of the 5th article of the Code, which allows an appeal 'from an order dissolving an injunction,' the complainant has prayed an appeal from the order so passed, which has been granted.

" In addition to the privilege of appeal, of which the complainant has thus availed itself, it desires to obtain the benefit of the 23d section of the same article of the Code, which declares that 'No appeal from any order shall stay the executors, or supend the operation of such order, unless the party praying the appeal shall give bond, with security, to indemnify the other party from all loss and injury which said party may sustain by reason of such appeal, and the staying of the operation of such order; such bond to be approved by the Judge of the Court where the proceedings are pending,' &c.   For the purpose of placing the complainant in a condition to obtain the benefit of this section, the solicitor of the complainant tenders to the Court for its approval, a bond with security, to be signed by the Mayor, with the seal of the city thereto attached by the officer having charge thereof, in such penalty as the Court may prescribe, and in the condition required by said section.   It is to be observed, that a bond approved by the Court under this section, must be sufficient to indemnify the other party from *all loss and injury which such party may sustain* by reason *of the appeal,* and *staying the operation of the order.*

"If, then, the operation of the order passed by this Court dissolving this injunction is to be stayed, and the injunction consequently restored, and the railroad company thus prevented from making this investment, the corporation of Baltimore must indemnify the company from all loss and injury which it may sustain thereby, by giving the required bond.   One of the objects to be accomplished by the purchase is to prevent the loss of its mortgage claims for $400,000, and arrears of interest amounting now to more than $600,000; another is, to secure a valuable trade, which it may lose if this first mortgage should pass into the hands

of a rival company. To cover the damage which the company may sustain by losses such as these, the penalty of the bond should be of very large amount. Several millions of dollars could not be deemed unreasonable for this purpose. In *Blondheim vs. Moore*, 11 *Md. Rep.*, 372, the Court of Appeals says: 'The bond is given for the express purpose of indemnifying' the other party 'from all loss and injury, which he may sustain because of the appeal. The Act provides that the bond shall be approved by the judge, &c., and *we are bound to assume this power will be exercised with every caution, and not until the Court is fully certified of its sufficiency.*' It will be perceived, then, that the responsibility imposed upon the Court, in reference to this bond, is of a most serious and weighty character.

"The conclusion, however, to which I have come, upon the question of the power of the Mayor, or any other official agent of the corporation, to execute a bond of this character, or to enter into a contract of the nature of which such an obligation of this kind would create, is such, that it is not necessary for me to fix a penalty for this bond. In my opinion no officer of a corporation has such power.

"To perceive, distinctly, the point of controversy in this matter, it is proper to keep in mind that this view does not affect the power of the Mayor to institute legal proceedings in the exercise of the right of the corporation to 'sue,' given to it by its charter, nor to his right to take an appeal, as has been done in this case, from the decree or judgment of an inferior Court; nor does it touch the question whether the Mayor and City Council can, by ordinance or resolution, authorize and empower the Mayor, or any other official agent, to execute such a bond as the Code requires for the purpose aforesaid; such powers may be undisputed, and in this particular case it is conceded that he has the power to take an appeal, and to prosecute it to a final result, which can be done without giving such bond. The simple question then is, can the Mayor or any other official of the corporation, bind it by such a bond or obligation, as is pro-

poposed to be given under this section of the Code? No ordinance or resolution of the corporation has been exhibited to the Court, conferring such power upon him; nor is it insisted that he possesses it by virtue of any such ordinance or resolution. Assuming that he has power, not derived from ordinance, as the agent of the corporation to bind it, in some cases, by contract or obligations, yet this could only apply to contracts necessary and proper to carry out the purposes and objects of its charter, and not to one of this character, which has no connection with such purposes and objects. The right of the Mayor, however, to give this bond, is not claimed by virtue of any ordinance, but it is insisted that it is incident to the power which, it is said, he has, to cause suit to be brought on behalf of the corporation, and to prosecute appeals from judgments or decrees rendered against it. Now, if he has such power to prosecute suits and appeals, he cannot justly claim, as incident thereto, any power or rights not necessary to enable him to prosecute suits, or, as in this case, to prosecute an appeal. The giving of such a bond is by no means necessary to the complete exercise of the right or privilege of appeal, it can be prosecuted as fully without it as with it, and, consequently, it cannot be claimed as incident to the power of taking an appeal in such a case. Such a bond as that which it is proposed to give, in connection with this appeal, *would be the contract or obligation of the corporation of the city.*

"In reference to contracts made by the corporation, it will be found, on reference to the ordinances prescribing the duties of certain officers connected with its fiscal department, and to other municipal legislation, that all contracts made by the corporation must be directed or authorized by the Council, the legislative department of the city government. The correctness of this view, I think, is manifest from the provisions of the revised ordinances of the city. No. 9, entitled, 'An Ordinance to appoint a comptroller, and prescribing his duties,' 4th section provides: 'That the said comptroller shall examine *all con-*

*tracts made by the city officers.'* He shall report within thirty days after the meeting of the Council in annual session, *all contracts made by the corporation, as directed or authorized by the Council.* Whilst there can be no doubt from the language of these quotations, that *contracts* can *be made* by certain *city officers,* and *it may* be in some cases by the *Mayor,* yet it is quite as clear that if they are to be regarded as *'contracts made by the corporation,'* they must be made *'as directed, or authorized, by the Council,'* otherwise they will not have obligatory force to bind the corporation.

"Again, in the second section of this ordinance, it is declared, 'that it shall be the duty of said comptroller to *examine all accounts* in which the corporation is concerned, either as debtor or creditor, where *provisions* for *the settlement thereof is made by law,* and *where no provisions has been made,* to report to the City Council the facts relating thereto, with his opinion thereon.' From this it appears, that no claim against the corporation, *as debtor,* such as a claim upon the bond would be, can be settled, unless provision for the settlement of it had been made by law. This officer, in the discharge of the important and responsible duty imposed upon him by this ordinance, would necessarily inquire, whenever a claim *against the corporation as debtor* was submitted to him, whether the officer who entered into the contract, or obligation, was legally authorized to do so, or if he was not at the time he entered into it, whether the City Council had ratified his act, and made provision for the settlement of the debt. The duty to be performed by this officer shews how important it is, that every party who enters into a contract with an officer of the city, or takes an obligation from him, intended to bind the corporation, should be satisfied that the officer is authorized by law, or ordinance, to bind it in such manner; such officer should be prepared to point out the ordinance which gave him the power to enter into such contract, or obligation, or to shew that the power or right to do so, was so necessarily incident to some power conferred upon him.

by ordinance, that no reasonable doubt could exist upon the subject; otherwise at some distant day, some future comptroller may condemn the claim arising out of it, and report it to the Council, which may not think proper to make provision for the settlement of it, (with his opinion against it,) and thus great loss and damage may be incurred, all of which migh have been avoided if it had been clearly shown at the time the contract was entered into by the city officer, that he was acting under the ordinance of the city in making the contract. Such considerations, as the foregoing, would admonish any private individual to act with caution, in transactions with city officers, in which they assume to bind the corporation. This Court, therefore, in a matter of so much magnitude as the obligation now proposed to be assumed for the corporation, and intended to indemnify the railroad company against the heavy losses that it may sustain, must act with the utmost caution, and not take a bond, in regard to the obligatory force or sufficiency of which any reasonable doubt may be entertained. In confirmation of the views above expressed, in regard to the necessity for an ordinance of the Council directing and authorizing the making of all contracts which are to bind the corporation, I refer to the 5th sec. of 8th Ordinance, which provides for the appointment of a register, &c., which shews, that if the contract or obligation requires the seal of the city to be attached to it, as this bond would, it must appear that the seal is called for 'in a case in which it is required by *an ordinance of the corporation.*' That section directs that the 'register shall take under his charge the *corporate seal* of the city, and *use* it *in all cases* which now are, or may hereafter be, *required*, either *by the* laws of the United States in the several States, the *ordinances of this corporation*, or the usage and customs of nations.'

"It is so clear upon principle, and from reasons derived from the legislation of the corporation, that such a bond as this could not be given so as to bind it, without

express authority conferred by ordinance, as to be almost unnecessary to refer to any decided cases on the subject. There is one, however, which should not pass unnoticed, because its analogy to this is very close, and because it decides the principle which I have adopted to regulate my action. It is reported in 30 *Vermont,* (1 *Shaw's*) *Reports,* 157 to 171, in the name of *The Bank of Middleburg vs. The Washington and Rutland Rail Road Co.* That was the case of an action against that Rail Road Company on a replevin bond, which was on its face executed by the said Rail Road Company, by Geo. W. Strong, president of said company, and there was a question raised as to the validity of the said bond, on the ground that there was a want of authority in the president of the said company to execute the bond in behalf of the corporation. The judge who decided the case below, and whose judgment was affirmed, said: 'That John W. Strong had no incidental powers which would enable him to execute the replevin bond so as to bind the company, but it must be found that, the board of directors, at a meeting where the major part of them were present, unitedly assented to the execution of the replevin bond by Strong, as their president, on behalf of the company, which would confer upon him a power to execute it.' The Chief Justice in deciding the case above, says: 'Nothing more is requisite than to shew the authority of the agent to contract in behalf of the company in the particular form, that is, with a seal. To this purpose it is required: 1. To shew the authority of the agent to make that contract in some form. That does not seem to be the question in the present case. The case shews the express assent of the majority of the board of directors. There is no ground to question that a corporation is bound by the action of a majority of the board of directors, expressed in the usual mode which they adopt in the transaction of the business of the board.' And he proceeds to say: 'It must appear that the *majority of the board of directors assented to the execution of a contract* of the class in question, or that

they subsequently adopted it.' I am therefore of opinion, that the Mayor has no power or authority to execute a bond of the character offered; nor has any other officer of the city such power or authority; and must therefore decline approving such a bond."

From this refusal of the Court to approve the bond, the complainant also took an appeal, which was heard at the same time with the appeal from the order dissolving the injunction.

The cause was argued before BARTOL, GOLDSBOROUGH and COCHRAN, J.

*John L. Thomas,* for the appellant, referred to the act of 1836, ch. 276, and commented on the power of the appellee under that act. He also argued in favor of the following points, as stated in the appellants' brief:

1. A corporation is the creature of the law, and derives all its powers from the act of incorporation—it is exactly what that act has made it, and is incapable of exerting any other faculties than those conferred by that act, or in any other manner than it authorizes. *Grant on Corp.*, 291, 292. *Head & Amory vs. The Providence Ins. Co.*, 2 *Cr.* 127, 166. *Dartmouth College vs. Woodward,* 4 *Wheat.*, 636. *United States Bank vs. Dandridge,* 12 *Wheat.*, 68. *The N. Y. Fire Ins. Co. vs. Ely,* 5 *Conn.*, 560. *Perrine vs. Ches. & Del. Canal Co.*, 9 *How.*, 172, 183, 184. *Lathrop vs. Com. Bank,* 8 *Dana,* (*Ky.*,) 114.

2. Every act of incorporation must be construed in such manner, if possible, as not to exceed the sovereignty of the Legislature granting it. It ought not, therefore, to be deemed to authorize any act to be done which would exceed the jurisdictional power of the State, or interfere with the rights of other States. *Farnum vs. The Blackstone Canal Co.,* 1 *Sumn.,* 46, 62. *Abbott vs. Balto. & Rapp. Steam Packet Co.,* 1 *Md. Ch. Dec.,* 542. *Bank of Augusta vs. Earle,* 13 *Pet.,* 587.

3. A railroad corporation is no exception to the rule requiring a strict construction of corporate powers. *Colman vs. Eastern Counties Railway Co.*, 10 *Beav.*, 1.

4. If the power claimed be not a power expressly granted, but one existing by implication, it must be shown that the implied power is necessary to carry into effect the powers expressly granted. In one case of high authority it is said that it must be incidental to its very existence. *Dartmouth College vs. Woodward*, 4 *Wheat.*, 636. *Penn., Del. & Md. Steam Nav. Co.*, 8 *G. & J.*, 318, 319. *The People vs. The Utica Ins. Co.*, 15 *Johns*, 383. *Beatty vs. Knowler's Lessee*, 4 *Pet.*, 168, 171.

On the second appeal he contended:

1. That the corporation of the city has power by its charter to *sue and be sued*. *Code Pub. Local Laws*, 152, *sec.* 1. *Alexandria Canal Co. vs. Swann*, 5 *How.*, 89.

2. The seal of a corporation affixed to a bond of the corporation is *prima facie* evidence that it is affixed by the proper authority. *Ang. & Am.*, *sec.* 224.

*J. H. B. Latrobe*, for the appellee, stated that he would not discuss or dispute any of the points of the appellant's brief. And he contended that the residence of a corporation in one State, by which it has been created, forms no bar to its powers of contracting in another State within the scope of its charter, and not inconsistently with the laws of such other State. *Bank of Augusta vs. Earle*, 13 *Peters*, 579. *N. Y. Dry Dock vs. Hicks*, 5 *McLean*, 111.

That the true construction of the Appellee's charter authorises it to aid roads lying in other States by subscribing to their construction, provided they are in connection with, or in continuation of roads lateral to the road of the appellee. *Mayor & C. C. of Balt. vs. B. & O. R. R. Co.*, 6 *Gill*, 288, 297.

Such aid may be given by subscription to the capital stock or by loan of money, and the right to give it includes the right to take, and enforce securities connected there-

with. *Bk. of Augusta vs. Earle*, 13 *Peters*, 579, &c. *Ingraham vs. Speed*, 30 *Miss.*, 410. *Sackett's Harbor Bk. vs. Lewis Co. Bk.*, 11 *Barb.*, 213. 1 *Pratt*, 364. 21 *Howard*, 441.

The case in 10 *Beavan* is not like the present, there being no legislation to justify the acts complained of in that case. In the case in 1 *Md. Ch. Dec.*, 549, the charter of the company did not authorize the disputed acts.

That it was therefore lawful for the appellees to lend to the Central Ohio Rail Road Company the $400,000 mentioned in the bill of complaint, and to take security therefor by way of mortgage. And that if such loan was in peril of being lost in consequence of the proceedings of a prior mortgagee, the appellee was at liberty to substitute itself in place of the first mortgagee, by paying the debt and taking the security. *Clark vs. Smith*, 13 *Peters*, 123. *Thompson vs. Chandler*, 7 *Greenleaf*, 377. *Clark & Smith vs. Smith*, *Saxton*, 121. *Pardee vs. Van Anken*, 3 *Barbour*, 534. *Farrar vs. Crosby*, 7 *Fosler*, 30.

That irrespective of the appellee's right of subrogation, it was authorized under its charter to make the purchase of the mortgage bonds complained of, as a direct aid to the Central Ohio Rail Road Company, even after the amount of the purchase money had been, in fact, expended, if the president and directors were of opinion, that it was necessary to the maintenance of a connection advantageous to the appellee. *Thompson & others vs. The N. Y. & Harlem R. R. Co. and others*, 3 *Sandford Ch. Rep.*, 625.

In the second case he contended, that the seal of the corporation is only *prima facie* evidence of the standing of the plaintiff in Court, and that it is admissible to introduce evidence to shew, that the seal was affixed without sufficient authority, and that the ordinances of the Mayor and City Council of Baltimore offered in evidence, indicating, as they do, the custodian of the seal of the corporation and limiting his use of it, throw upon the appellant the burden of proving that the use was authorised in the particular

iustance. *St. Mary's Church Case,* 7 *Serg. & Rawle,* 531. No. 8, Rev. Ord. 1858, p. 6.

*William Price,* for the appellant in reply, read from and commented on the Acts of 1826, ch. 123, 1830, ch. 117, 1857, ch. 314, and the powers of the appellee thereunder. He also read from p. 204, of the Compilation of the Laws of Virginia. He said: That the idea of investing $1,250,000 in a concern in the condition of the Central Ohio R. R. Co., in order to secure $400,000, was absurd; and contended, that there was no power in the appellee to go out of the State to buy the stock or debts of foreign corporations.

BARTOL, J., delivered the opinion of this Court:

The question presented by this appeal is one of great importance, both on account of the magnitude of the interests involved in the cause, and of the general importance of the principles involved in its decision.

We have read with much care the elaborate opinion delivered by the learned judge of the Circuit Court, and examined the adjudged cases in England and this country, cited by him, as well as those referred to in the argument, and are of opinion that the conclusions stated by him are in general correct. It is not necessary for us however, in disposing of the case, to enter upon the discussion of all the points presented in the briefs, and argued with so much ability by counsel.

The facts presented by the record, so far as it is material to refer to them, may be briefly stated as follows: By a lateral road which diverges from the main stem, the Baltimore and Ohio Rail Road extends to a place called Benwood, on the bank of the Ohio River, opposite Belair, the station of the Central Ohio Rail Road, with which it connects by means of a steam ferry boat, for the benefit of goods and passengers. Some time before the filing the bill in this cause, the appellee had loaned to the Central Ohio

Road $400,000, which was secured by the bonds of the latter, and a mortgage of its property, subject however to the encumbrance of prior mortgages, amounting in the aggregrate to $3,000,000. The first and second mortgages constituting the first mortgage on the whole road amounting to the sum of $1,250,000. On the same day this bill of complaint was exhibited, the appellee, at the meeting of the board of directors, adopted the resolution to be found *ante* page 62, and the object of the bill was to obtain an injunction prohibiting the appellee from carrying into effect the object and purpose of the resolution.

The ground upon which the interposition of the Court was invoked, was, as alleged in the bill, because the Act contemplated by the resolution was "beyond the corporate powers of the Baltimore and Ohio Rail Road Company."

The appellee claims the right to make the advance and appropriation of money for the purpose stated in the resolution, on two grounds: 1st. Under the supplement to its charter passed in 1836, ch. 276. 2nd. Because being a mortgage creditor of the Central Ohio Rail Road Company to the amount of $400,000, it has the power to purchase the prior mortgage, for the purpose of preventing a foreclosure of the same, and the consequent loss of its own mortgage claim.

These propositions will be briefly considered in the light of the well established principles of law, governing the construction of statutes conferring powers upon incorporated c mpanies. These principles are stated with great precision and clearness in the first, second, third and fourth points of the appellant's brief. To each one of which we assent, without repeating them here, except that we do not agree to the proposition stated in the last part of their fourth point, "that a corporation cannot exercise any implied powers, except such as are shown to be incidental to its very existence." To adopt such a principle would be carrying the doctrine of strict construction too far, and would in many cases defeat the ends and objects of the charter.

Acts of incorporation, like other statutes, must have a reasonable and feasible interpretation, so as to accomplish the intention of the Legislature, and all such powers are implied as may be necessary to carry into effect those expressly granted—that is to say, such as are reasonably incidental to the exercise of the express powers.

It must also be borne in mind, that we are not dealing with an ordinary private corporation, created only for the pecuniary benefit of its stockholders. The powers granted to the appellee are of the most extensive and comprehensive kind, involving in their exercise great public interests, to promote which was the chief object of its charter. Looking to the great and important objects which the Legislature designed to accomplish by the charter of the Baltimore and Ohio Rail Road Company, the Court of Appeals (in 6 *Gill*, 297) have declared the rules by which its charter ought to be construed.

After stating that the Legislature regarded the completion of the work as a "great State object," the Court say: "In expounding, therefore, those provisions of the charter of the Company, by which its expressed privileges and exemptions are imparted, liberal rules of interpretation for its benefit ought to be adopted to effectuate the benevolent designs of the Legislature, and not such rules of restriction and limitation as should be applied to the charters of Companies incorporated for the peculiar benefit of their stockholders."

We come now to the supplement of 1836, ch. 276, and find the appellee authorized, according to its discretion, " to subscribe towards the construction of any lateral, continuing, or connecting road, and acquire an interest therein to an extent not exceeding two-fifths of its estimated cost."

We are clearly of opinion, upon the agreed facts in this record, that the Central Ohio Road is a road connecting with the Baltimore and Ohio Rail Road, within the meaning of the Act of 1836, and that consequently the "appellee possessed the express power under its charter, to sub-

scribe for or aid in its construction, to the extent declared in the Act. Under such a power the appellee might lawfully loan or furnish money to the Ohio Company to aid in its construction, and take a mortgage or other security therefor. We adopt the rule stated by the Court in 3 *Sandford's Ch. Rep.*, 625, that where the thing done by a corporation is substantially that which its charter authorized, Courts have not been disposed to declare the Act unauthorized, though not strictly and literally the same as that mentioned in the law."

It is not necessary for this Court to express any opinion upon the abstract question, whether the appellee would be authorized under the Act of 1836, without reference to its existing claim against the Ohio Company, to make the appropriation necessary to acquire the first mortgage claim against that company, with the view and purpose of controlling the working of that road, so as to promote the great interests involved in the successful operations of the Baltimore and Ohio Rail Road.

The appellee was a creditor of the Ohio Company to a large amount. No allegation is made in the bill that the debt so existing was not lawfully created, and within the corporate powers of the appellee. Now one of the purposes declared in the resolution for making the advance necessary to acquire the first mortgage, was for the security of the debt already due. This Court cannot say that such a purpose was not perfectly legitimate and proper, and the means proposed fairly within the implied powers of the Company. In such a case, the decision of questions of expediency, as to the fitness of the means employed, are properly confided by the law to the Board of Directors. Courts of Justice will not undertake to pass upon them—they are manifestly incompetent to the task—and to attempt to do so, would often defeat the ends of the law. Their province is to determine only whether the corporation, in the Act complained of, has exceeded its corporate powers; and having arrived at the conclusion in the case before us,

that the bill of complaint is not well founded in that behalf, the order of the Circuit Court dissolving the injunction will be affirmed.

We concur in the ruling of the Judge of the Circuit Court upon the question presented by the second appeal, and, for the reasons assigned by him in his opinion thereon, we affirm that order also.

*Orders affirmed.*

(Decided Feb'y 24th, 1864.)